# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **GREAT AMERICAN INSURANCE COMPANY,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action Number |
| **v.** | ) | **2:08-cv-01687-AKK** |
| | ) | |
| **JEFFERSON COUNTY COMMISSION; B.L. HARBERT INTERNATIONAL, L.L.C.,** | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| **B.L. HARBERT INTERNATIONAL, L.L.C.; JEFFERSON COUNTY COMMISSION,** | ) | |
| | ) | |
| Counterclaim Plaintiffs, | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **GREAT AMERICAN INSURANCE COMPANY,** | ) | |
| | ) | |
| Counterclaim Defendant. | ) | |

## MEMORANDUM OPINION

The court has before it Defendant/Counterclaim Plaintiff B.L. Harbert

International, LLC's ("BLH") Motion for Summary Judgment, (doc. 48),[1] and

---

[1]Reference to a document number, ("Doc. ___"), refers to the number assigned to each document as it is filed in the court's record.

Plaintiff/Counterclaim Defendant Great American Insurance Company's ("GAIC")

Motion for Summary Judgment, (doc. 91).  Defendant/Counterclaim Plaintiff the

Jefferson County Commission ("the JCC") adopts and incorporates BLH's

arguments, (doc. 96).

   In short, GAIC underwrote a Builder's Risk Policy ("the Policy") for the

JCC's renovation of the Five Mile Creek Wastewater Treatment Plant, which

included the construction of the New Headworks Facility.  The JCC hired BLH as

the general contractor for the renovation and Hendon Engineering for the

engineering work.  On December 16, 2007, the New Headworks Facility flooded,

causing extensive damage.  GAIC denied claim coverage and now seeks a

declaratory judgment that the Policy for that structure terminated prior to the flood

and that GAIC has no obligation or liability to any insured for the occurrence.

BLH cross-moves, seeking summary judgment on its breach of contract claim and

an award of damages.

   For the reasons stated below, the court DENIES GAIC's motion for

summary judgment and GRANTS, in part, BLH's motion for summary judgment.

As previously contemplated by the court, the parties are entitled to further

discovery on damages and the court therefore DENIES BLH's motion to the extent

it seeks a computation of damages.[2]  Within **twenty-one (21) days** of the date of this order, the parties shall submit a joint status report setting forth what further discovery on damages, if any, is required, and a reasonable schedule for completing that discovery and briefing any remaining disputes.

I.    **FACTS**[3]

    *A.    The Project*

On June 7, 2005, the JCC awarded a contract to BLH, naming it the general contractor on the Five Mile Creek Wastewater Treatment Modifications Project (the "Five Mile Project"), which was projected to take three years.  Doc. 93-1 at 7-9 (Dep. pp. 18, 25-26).  The JCC undertook the Five Mile Project to expand and upgrade existing facilities at the sewage treatment plant to, *inter alia*, increase the average daily flow capacity, increase the peak flow storage capacity, provide effluent filtration of the flows, and provide ultraviolet disinfection of the flows. Doc. 93-1 at 5 (Dep. p. 16).  The upgrade and expansion was prompted, at least in part, by a modification in the JCC's National Pollution Discharge Elimination

---

[2]This case was randomly reassigned from Judge R. David Proctor to the undersigned on January 7, 2010.  Doc. 45.  The Amended Scheduling Order entered on February 3, 2009, set forth discovery and dispositive motion deadlines solely for coverage issues.  Doc. 26.  The court later extended those deadlines by text orders dated May 11, June 10, and November 23, 2009. The court finds nothing in the record, however, suggesting that the extensions expanded the original scope of discovery to include damages as well as coverage issues.

[3]The facts are undisputed unless otherwise noted.

System ("NPDES") permit,[4] to increase peak flows.  *Id*.

The Five Mile Project contained several components, including the construction of the New Headworks Facility.  In addition to housing the influent pumps, the New Headworks Facility was designed to "include[] screening, grit removal, . . . aeration blowers, auxiliary generators and a control system to control that system."  *Id.* at 7 (Dep. p. 18).  Additionally, one objective of the Five Mile Project was to automate the treatment plant, including the New Headworks Facility.  *Id*.  For the automation, BLH hired subcontractor United Controls Corporation ("UCC") to develop and install a SCADA[5] control system, which would eventually run the entire plant, including the New Headworks Facility.  *Id.* at 28-31 (Dep. pp. 173-77); Doc. 61 at 33-34 (Dep. pp. 32-33); 93-11 at 2.  The contract required the existing wastewater facilities to remain in use during the construction.  Doc. 93-1 at 9 (Dep. p. 26).

### B.    The Policy

The contract between BLH and the JCC required BLH to participate in Jefferson County's Owner Controlled Insurance Program ("the OCIP").  Doc. 50

---

[4]The Environmental Protection Agency grants the NPDES permits.  *See* http://cfpub.epa.gov/npdes.

[5]SCADA stands for "supervisory control and data acquisition."  Doc. 61 at 32-33 (Dep. pp. 31-32).

at 95.  Under the OCIP, Jefferson County procured the Policy from GAIC.  Doc.

60.  GAIC issued Policy No. IMP601-41-13-01 with effective dates of coverage

from November 15, 2007, to November 15, 2008, to the JCC as a Named Insured.

*Id.* at 2.  Endorsement Form IL 71 25 (Ed. 10/92) later added "All Contractors &

Sub-Contractors" as Named Insureds.  *Id.* at 4.

With respect to termination, the Policy provides:

**6.  When Coverage Begins and Ends**

We cover from the time the Covered Property is at your risk starting
on or after the date this policy begins.

This coverage will end on each structure when any of the following
occurs:

a.   the purchaser accepts it;
b.   your interest in the Covered Property ceases; or you abandon
     the construction;
c.   90 days after the structure is "substantially completed" (if no
     work on the structure has taken place during that period);
d.   when a structure is occupied or put to its intended use, without
     our written consent;
e.   any other insurance covers the property as a completed
     building or structure;
f.   this Coverage Form is cancelled; or
g.   the end of the policy period.

*Id.* at 12.

### C.    *New Headworks Facility Pump Installation*

The New Headworks Facility, which was scheduled for completion prior to

completion of the entire Five Mile Project,[6] houses the influent pumps.  Doc. 93-1

at 7,18-19 (Dep pp. 18, 161-62).  Before their installation, the new Flowserve

pumps passed a required factory testing in October 2007.  *Id.* at 14-15, 36-37

(Dep. pp. 61-62, 226-27).  After their installation in October, the JCC began

running the new pumps intermittently.[7]  *Id.* at 36-38 (Dep. pp. 226-28).  On

November 7, 2007,[8] the New Headworks Facility pumps began running on a

continuous basis.  Doc. 93-4 at 3-4 (Dep. pp. 50-51); Doc. 93-5.

###   D.   *State of Construction at the Time of the Flood*

Beginning at approximately 11:30 p.m. on December 15, 2007, and

continuing through the early morning hours of December 16, 2007, a flood

occurred in the New Headworks Facility.  Doc. 93-6 at 3.  Robert Holbrook

("Holbrook"), the Project Engineer for the Five Mile Project, later concluded that

the control system installed by UCC improperly took the pumps out of service,

---

[6]The entirety of the Five Mile Creek Project was declared substantially complete on December 31, 2008.  Doc. 93-3 at 3.

[7]The JCC holds the NPDES permit for the collection, treatment, and discharge of the wastewater to the Five Mile Creek facility.  Under that permit, only the JCC has the legal authority to operate the wastewater facility, and the JCC is required to have a certified operator present twenty-four hours a day, seven days a week.  Therefore, throughout the Project, the JCC remained in control of plant operations.  Doc. 63 at 18-19 (Dep. pp. 17-18).

[8]Daniel White, a JCC employee, testified that the pumps began running on a continuous basis sometime between November 7 and November 12, 2007.  Doc. 93-4 at 6-7 (Dep. pp. 53-54).  Because BLH does not dispute the November 7 date and any dispute would be immaterial, the court will assume that November 7 is the correct date for continuous operation of the pumps.

which caused the flood.  Doc. 93-1 at 34 (Dep. p. 199).

BLH identified the following items at the New Headworks Facility that were uncompleted at the time of the flood:[9]

(a)  The blowers were not yet operating at the property;

(b)  Mechanical startup was being performed, but had not been completed, for all of the various pieces of equipment had to be started up by authorized certified factory representatives;

(c)  Programming for Pump Controls had to be completed; and

(d) In addition, the following items had *not* been completed and/or installed . . . : (1) An air conditioning unit in the electrical room; (2) Door hardware; (3) Grouting in Raw Sewage discharge lines at floor penetrations; (4) Painting of mechanical equipment; (5) Thorosealing exposed concrete; (6) Interior and Exterior Painting; (7) Monorail One Ton Hoist; (8) Jib Crane One Ton Hoist; (9) Bridge Crane Ten Ton Hoist; (10) Exterior Caulking; (11) Exterior Masonry; (12) Diesel tank lines penetrations; (15) Generator mufflers and exhaust piping; (16) Suspended ceiling; (17) Concrete floor sealer; (18) Aluminum ceiling above the diesel tank; (19) Elevator; (20) Controls for RSD pumps; (21) Manual mode controls for Turblex blowers; (22) Manual mode for Turblex variable vain blowers; (22)[10] Controls for generators; (23) Computer monitoring system; (24) Aluminum handrails throughout the building; (25) Asphalt paving; (26) Curb and gutter; (27) Landscaping; (28) Sidewalks; (29) Site Work; (30) Yard inlets; (31) Ceramic Tiles; (32) Electrical trim out; (33) IP Addresses for Rotork Valves; (34) Installation of Fire Extinguishers; (35) Building Inspection and Certificate of Occupancy; (34) Point and patch concrete surfaces;

---

[9]GAIC neither disputes this list nor disputes that the New Headworks was not "100% complete" on December 16, 2007.  *See* Doc. 97 at 3-4 (admitting ¶¶ 9, 17).

[10]The list contains two Nos. 22.

7

(37) Roof Drains at the New Headworks; (38) Structural Steel for the
Classifiers; (39) Aluminum Grating; (40) Bathroom Partitions;
(41) Door Caulking; (42) Bathroom Accessories; (43) Vibration
Monitors; (44) Emergency stops for Raw sewage pumps; (45) Fiber
Optic Network; (46) Power Monitoring; (47) Fire alarm system;
(48) Preliminary Punch list by B.L. Harbert; (49) Preliminary Punch
list by the Engineer; (50) Final Punch list by Owner; (51) City of
Birmingham's Fire Marshal Inspection; (52) Functional testing;
(53) Overhead City of Birmingham's Mechanical and Electrical
Inspections; (54) City of Birmingham's Building Inspection; and/or
(55) the City of Birmingham's Certificate of Occupancy had not been
issued.

Doc. 49 at 5; Doc. 21 at 9-11.[11]  Furthermore, at the time of the flood, BLH had

not demolished the existing pumps and blowers in the Old Headworks Facility.[12]

Doc. 61 at 48-49 (Dep. p. 47-48).  Additionally, the SCADA control system was

not fully operational at the time of the flood.  *Id.* at 55-56 (Dep. pp. 54-55).  As a

consequence, at least in early December, "the operators were having to do some

things in the new headworks building on a manual basis rather than the system

being on an automated basis."  Doc. 64 at 21 (Dep. p. 20); *see also* Doc. 64 at 46

(Dep. p. 45).  Further, the JCC plant operators were not allowed to operate out of

---

[11]The Plant Manager further testified that, at the time of the flood, "[n]o walkthrough had
been performed.  The building was not complete.  Several things in the building hadn't been
done according to the specs.  All the spare parts had to be turned over, all the equipment had to
be operating and a final punch list had to be done, completed before we would accept the
building. . . .  And that had not been done."  Doc. 64 at 10-11 (Dep. pp. 9-10).  He further
testified that the blower system was not complete.  *Id.* at 15 (Dep p. 15).

[12]Had the flood not occurred, BLH would have started the demolition the following week.
Doc. 62 at 25-26 (Dep. pp. 177-78).

the New Headworks Facility control room because the building had not received a certificate of occupancy and the electrical control systems were not in place to permit operation from the building.  Doc. 63 at 20 (Dep. p. 19); Doc. 64 at 14 (Dep. p. 13).

Additionally, Holbrook testified that BLH was still working at the New Headwork Facility on the date of the flood[13] and, in the absence of the flood, BLH would have needed approximately one month to complete the unfinished work at that site.  Doc. 61 at 95-96 (Dep. pp. 94-95).

BLH performed the cleanup and repairs necessitated by the flood.  Doc. 93-7 at 5.  BLH subsequently made a claim to GAIC under the Policy and submitted a claim to the JCC for $639,051.55, plus interest, for its costs.  *Id.* at 5-6.

### E.    *Disputed Facts Regarding Whether BLH and the JCC Were Testing the New Headworks Facility at the Time It Flooded*

BLH argues that the New Headworks Facility was still in the testing phase on December 15, 2007, when the flooding began.  In support of its position, BLH notes that Holbrook testified that, at the time of the flood, the New Headworks Facility was being tested prior to the demolition of the pumps and the blowers in the Old Headworks Facility.  Doc. 61 at 48-49 (Dep. pp. 47-48).  Daniel White, a

---

[13]The flood occurred late on Saturday night and early Sunday morning, so the constructions crews were not physically on site when it occurred.  Doc. 63 at 19 (Dep. p. 18).

JCC employee involved with the Project, also testified that the New Headworks Facility was still in the testing phase at the time of the flood.  Doc. 63 at 16 (Dep. p. 15).

UCC installed the changes to the control systems on December 13, 2007, but it had not yet conducted the contractually-mandated tests of the system to "be made in the presence of the engineer that the entire system shall be shown to work" and had it scheduled for the week after the flood.  Doc. 87 at 71-72 (Dep. pp. 310-11).  Holbrook testified that pumping operations at the New Headworks Facility would continue during the controls testing as well as during the electrical system testing.  *Id.* at 72 (Dep. p. 311).

GAIC contends that the New Headworks Facility was operational and was not in the testing phase at the time of the flood.  In support, GAIC points to Holbrook's testimony that the contract specifications provided for testing of the pumps in four stages: factory testing, on-site testing, intermittent testing, and continuous operation testing.  *Id.* at 65 (Dep. p. 304).  The final stage – continuous operation testing – is mandated by Section 9.11(r) of the contract, which provides: "In the presence of the Engineer, such tests as necessary to indicate that the pumps and motors generally conform to the efficiencies and operating conditions specified shall be performed.  A thirty-day operating period of the pumps will be

10

required before acceptance." Doc. 53 at 14. Holbrook testified that the contract specifications did not require further testing on the pumps themselves after the thirty-day acceptance testing. Doc. 87 at 66 (Dep. p. 305). GAIC avers that the thirty-day period began on November 7, and was therefore complete prior to the flood on December 15 and 16. *See* Doc. 93-4 at 6-7 (Dep. pp. 53-54).

## II.    MOTION TO COMPEL AND MOTION TO STRIKE

Before delving into the summary judgment analysis, the court will address two motions filed after the parties fully briefed the summary judgment motions.

### A.    *GAIC's Motion to Compel*

On February 22, 2010, GAIC filed a Motion to Compel Production of Holbrook Memo, (doc. 102), seeking the production of a timeline of events authored by Holbrook that allegedly contradicts his sworn testimony. Doc. 102 at 3. The JCC responds that (1) the memorandum is privileged because Holbrook is an agent of the JCC, (2) Holbrook clarified any contradictions during the second day of his deposition, and (3) the motion is untimely because it was filed after the deadlines for discovery and dispositive motions. Doc. 104; *see also* Doc. 105. GAIC first learned of the memorandum during the deposition of Daniel White on July 30, 2009. Doc. 104 at 4. That same day, GAIC obtained a copy of the memorandum from Holbrook without the JCC's knowledge or permission. Doc.

104-1 at 12.  On August 4, 2009, the court held a teleconference with the parties,

ordering (1) the parties to submit a copy of the document for the court to hold *in*

*camera*, (2) Plaintiff to destroy all copies of the document, and (3) the parties to

attempt to resolve the dispute by sending out specific interrogatories, requests for

production, and deposition notices.  Text Order dated August 4, 2009.

Plaintiff had ample opportunity – four months – to conduct additional

discovery and then move to compel the document if that discovery failed to

provide the allegedly vital information in the memorandum.  Nevertheless,

Plaintiff waited until *after* the discovery deadline and the parties had fully briefed

their motions for summary judgment before seeking an order compelling

disclosure.  This motion is clearly untimely.  *See, e.g.*, *Payne v. Ryder Sys., Inc.*

*Long Term Disability Plan*, 173 F.R.D. 537, 540 (M.D. Fla. 1997) ("The Eleventh

Circuit has consistently held that motions filed after a deadline imposed by a court

should be denied as untimely."); *AB Diversified Enters., Inc. v. Global Transp.*

*Logistics, Inc.*, 2007 WL 1362632, at *1 (S.D. Fla. May 7, 2007) (denying a

motion to compel filed two months after the discovery deadline and after summary

judgment motions were fully briefed).  Plaintiff's motion is therefore DENIED.

### B.      *BLH's Motion to Strike*

BLH moves to strike portions of an affidavit of James Robert Galluzi

("Galluzi"), GAIC's Division Vice-President of the Property and Inland Marine

Division.  Doc. 103.  Specifically, BLH moves to strike the following statements:

(A)     "Pursuant to an endorsement, the Policy covers all contractors
        and subcontractors, none of which are identified by name
        anywhere in the Policy."  Doc. 98-2 ¶ 4.

(B)     "GAIC's Builder's Risk Plus® Coverage Form is based on a
        standard ISO form.  This standard ISO form is also used by the
        majority of insurance companies in the United States who
        provide builder's risk coverage."  *Id*. ¶ 5.

(C)     "Additional Condition 6(d) of the Builder's Risk Plus®
        Coverage Form, which stated that coverage terminates once a
        structure is 'put to its intended use, without our written
        consent,' is an industry standard provision."  *Id*. ¶ 6.

(D)     "[The insurance broker, Hill, Rogal & Hobbs of Alabama, Inc.]
        was responsible for communicating with the Jefferson County
        Commission (the Named Insured), signing the Policy, and
        delivering the original to the Jefferson County Commission."
        *Id*. ¶ 7.

(E)     "It is a standard industry practice to provide the original and
        copies of the insurance policy only to the Named Insured (i.e.,
        the entity who purchased the policy), unless the Named Insured
        requests otherwise."  *Id*. ¶ 8.

"A motion to strike will usually be denied unless the allegations have no

possible relation to the controversy and may cause prejudice to one of the parties."

*Story v. Sunshine Foliage World, Inc.*, 120 F. Supp. 2d 1027, 1030 (M.D. Fla.

2000) (citations and internal quotation marks omitted).  "An affidavit submitted in

connection with a summary judgment motion is subject to a motion to strike if it does not measure up to the standards of Rule 56(e) of the Federal Rules of Civil Procedure." *Id.* (citation omitted).  Rule 56(e) provides: "A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated."  Furthermore, "[t]he requirements of Rule 56 make it plain that affidavits which set forth conclusory arguments rather than statements of fact based on personal knowledge are improper."  *Breach v. Prison Health Servs.*, 2009 WL 2473636, at *1 (M.D. Ala. Aug. 12, 2009) (citations omitted).

With respect to ¶ 4, BLH argues that the Policy speaks for itself and that only the court's interpretation of the Policy, not Galuzzi's, is relevant.  Doc. 103 at 3.  GAIC counters that Galuzzi's testimony is helpful to the court and, moreover, it is undisputed that contractors and subcontractors are not identified by name in the policy.  Doc. 106 at 1-2.

"The issue whether a contract is ambiguous or unambiguous is a question of law for a court to decide. . . .  If the terms within a contract are plain and unambiguous, the construction of the contract and its legal effect become questions of law for the court."  *Nationwide Ins. Co. v. Rhodes*, 870 So. 2d 695, 696-97 (Ala. 2003) (citations and internal quotation marks omitted)).  The court

does not read ¶ 4 as a legal interpretation of the Policy, but rather as stating that

BLH is not actually identified by name in the Policy.  This fact is self-evident from

the Policy, and the court need not rely on Galuzzi's affidavit for that point, nor is it

necessary to strike the paragraph.  The motion to strike is DENIED with respect to

¶ 4.

BLH seeks to strike portions of  ¶¶ 5, 6, and 8 as improper because:

(1) Galuzzi's affidavit fails to establish that he is qualified to testify on industry

standards or what other insurance companies do; (2) the statements are conclusory

arguments rather than statements of fact; and (3) BLH identifies authorities that

contradict Galuzzi's statements.  Doc. 103 at 5-7.  Plaintiff counters that Galuzzi's

twenty-five years of experience make him competent to testify on the matters

stated within those paragraphs, that the paragraphs contain statements of fact

rather than conclusory arguments, and that BLH's citations to other sources do not

provide a ground for striking his testimony.  Doc. 106 at 3-4.

The challenged affidavit appears to be based on Galuzzi's personal

knowledge and further shows that he is competent to testify to the matters

included in the affidavit.  Specifically, his twenty-five years of insurance

experience provide an adequate basis for discussing standard industry practices.

Moreover, the court finds that the statements present facts rather than conclusory

arguments.  Finally, BLH's third argument – that the court should strike the statements because BLH cites to sources that purportely contradict them – is without merit.  Therefore, BLH's motion is DENIED with respect to ¶¶ 5, 6, and 8.

Finally, with respect to ¶¶ 7 and 8, BLH argues that Galuzzi's testimony regarding the insurance broker's responsibilities amounts to expert testimony.  The court disagrees – as it reads ¶¶ 7 and 8, Galuzzi merely testifies to the business arrangement between GAIC and Hill, Rogal & Hobbes ("HRH"), the insurance broker.  Galuzzi does not purport to define GAIC's or HRH's legal obligations. The motion to strike is therefore DENIED with respect to ¶¶ 7 and 8.

Although the court denies the motion to strike in its entirety, the court emphasizes that it will consider Galuzzi's statements only to the extent that it finds them relevant and probative.  *See Hawthorne v. Baptist Hosp., Inc.*, 2010 WL 716539, at *3 n. 7 (N.D. Fla. Feb. 25, 2010) (denying motion to strike but "reserv[ing] the right to disregard any of [the] statements in the summary judgment discussion on grounds of relevance or a lack of probative value").

## III.   SUMMARY JUDGMENT STANDARD

Under Rule 56(c)(2) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact

and that the movant is entitled to judgment as a matter of law."  "Rule 56(c)
mandates the entry of summary judgment, after adequate time for discovery and
upon motion, against a party who fails to make a showing sufficient to establish
the existence of an element essential to that party's case, and on which that party
will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322
(1986).  The moving party bears the initial burden of proving the absence of a
genuine issue of material fact.  *Id*. at 323.  The burden then shifts to the
nonmoving party, who is required to "go beyond the pleadings" to establish that
there is a "genuine issue for trial."  *Id*. at 324 (citation and internal quotation
marks omitted).  A dispute about a material fact is genuine "if the evidence is such
that a reasonable jury could return a verdict for the nonmoving party."  *Anderson
v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The court must construe the
evidence and all reasonable inferences arising from it in the light most favorable to
the non-moving party.  *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970);
*see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the
non-moving party's favor).  However, "mere conclusions and unsupported factual
allegations are legally insufficient to defeat a summary judgment motion."  *Ellis v.
England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald
Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)).

Additionally, "[t]he standard of review is unaffected by the filing of cross-motions for summary judgment." *Hope for Families & Cmty. Serv., Inc. v. Warren*, __ F. Supp. 2d __, 2010 WL 2629408, at *5 (M.D. Ala. June 30, 2010) (citations omitted).  "When considering motions from both parties for summary judgment, the court applies the same standard of review and so may not resolve genuine issues of material fact. . . .   Instead, we consider and rule upon each party's motion separately and determine whether summary judgment is appropriate as to each under the Rule 56 standard." *Monumental Paving & Excavating, Inc. v. Pa. Mfrs. Ass'n Ins. Co.*, 176 F.3d 794, 797 (4th Cir. 1999) (citations omitted); *see also Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n*, 483 F. 3d 1025, 1030 (10th Cir. 2007) ("Cross motions for summary judgment are to be treated separately; the denial of one does not require the grant of another." (quoting *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979))).

## IV.   ANALYSIS

### A.   *GAIC's Failure to Deliver a Copy of the Policy to BLH Did not Prejudice BLH.*

BLH argues that GAIC waived reliance on Condition 6(d) by failing to deliver a copy of the Policy to BLH.  Doc. 49 at 28.  GAIC contends that it provided the JCC with a copy of the Policy and that it had no obligation to provide BLH with a separate copy because BLH is not a named insured.  Doc. 97 at 14-15.

18

Alabama law requires an insurer to deliver a copy of a policy to certain parties.  Specifically, § 27-14-19, Ala. Code 1975, provides:

> (a) Subject to the insurer's requirements as to payment of premium, every policy shall be mailed or delivered to the insured or to the person entitled thereto within a reasonable period of time after its issuance, except where a condition required by the insurer has not been met by the insured.

Interpreting this provision, the Supreme Court of Alabama first concluded that, at a minimum, "the phrase 'the insured or . . . the person entitled thereto,' as it is used in § 27-14-19, should include the purchaser of the policy and the named insured in the policy." *Brown Mach. Works & Supply Co. v. Ins. Co. of N. Am.*, 659 So. 2d 51, 58 (Ala. 1995).  The court further held that the statute "requires that the insurance policy be 'mailed or delivered' to the purchaser of a policy and to the named insured, and that an insurer may be estopped from asserting conditions of, or exclusions from, coverage where such a purchaser or insured is prejudiced by the insurer's failure to comply with the statute." *Id.* at 61.  The court further emphasized that while "ambiguities in an insurance contract are to be construed in favor of the insured . . . [i]t is equally well settled in Alabama . . . that unambiguous policies are to be enforced as written." *Id*. at 59 (citations omitted).

19

This raises two questions: (1) is BLH a named insured[14] under the policy, and (2) if BLH was entitled to a copy of the Policy, did GAIC's failure to deliver the policy result in prejudice?  The court answers the first question in the affirmative.  The Policy reads:

> **It is agreed that the Named Insured and the Form of Business Organization shown in the Declarations is amended to read as follows:**

> NAMED INSURED:
>
> JEFFERSON COUNTY COMMISSION
> ALL CONTRACTORS & SUB-CONTRACTORS

Doc. 60 at 4.  GAIC cites this language but claims that BLH is not a named insured because it "is not named anywhere in the Policy."  Doc. 97 at 15.  GAIC presumes, without citation to authority, that an entity cannot be a named insured unless that entity's formal name appears in the insurance agreement.  That, however, is not the case.  *See, e.g.*, *Fireman's Fund Ins. Cos. v. Am. Int'l Ins. Co. of P.R., Inc.*, 109 F.3d 41, 45 (1st Cir. 1997) (the "Named Insured" under the policy was "Ayala 'and/or any subsidiary, associated, affiliated, newly acquired, or controlled corporation and/or company as may now be constituted or hereafter

---

[14]It is undisputed that the JCC purchased the Policy and therefore was entitled to a copy under § 27-14-19.

formed, and over which the named insured maintains ownership or majority

interest'"); *Guar. Nat. Ins. Co. v. Chester County Housing Auth.*, 714 F. Supp.

747, 748-49 (E.D. Pa. 1989) (policy designated the "Named Insured" as "Metro

Transportation Co. T/A Yellow Cab Co. and/or Other Individuals or Entities

Trading As Yellow Cab Co. or Operating Under the Authority of Metro

Transportation Co."). The Policy clearly identifies "all contractors & sub-

contractors" as "named insured," and the court will not create ambiguity where

none exists. Therefore, under § 27-14-19 and *Brown Machine Works*, GAIC had a

responsibility to deliver a copy of the Policy to BLH, which it did not do.[15]

GAIC further suggests that it fulfilled its obligation by delivering a copy of

the Policy to the JCC and HRH. Doc. 97 at 16. The Supreme Court of Alabama in

*Brown Machine Works*, however, very clearly stated that § 27-14-19 requires

delivery "to the purchaser of a policy *and* to the named insured." 659 So. 2d at 61

(emphasis added). An insurer's statutory obligation is thus not satisfied by

delivering a copy of a policy only to some of the parties protected by the statute.

---

[15]GAIC further argues that BLH may be an additional named or unnamed insured. Doc. 97 at 16-17. *Brown Machine Works* did not definitely answer whether those parties are also entitled to receive a copy of the policy from an insurance company. 659 So. 2d at 61. The above declaration, however, very clearly identifies "all contractors & sub-contractors" as "named insureds" not as "additional named insureds." *See Fireman's Fund*, 109 F.3d at 45 (distinguishing between companies identified in the policy as "Named Insured" and as "Additional Insured"). Given the clear language in the Policy, GAIC's argument lacks merit.

As Judge William H. Steele of the Southern District of Alabama noted, the policy behind this requirement is sound:

> If § 27-14-19 is designed to protect purchasers and named insureds from being ambushed by policy exclusions or conditions of which the insurer had never notified them, that objection would be defeated if the insurer could decide in its sole discretion to give notice to a purchaser but not a named insured, or to one named insured but not another named insured.  Such an obviously inadequate outcome would subvert the whole purpose of the statutory delivery requirement.

*W.G. Yates & Sons Constr. Co. v. Zurich Am. Ins. Co.*, 2008 WL 161921, at *8 n.17 (S.D. Ala Jan. 8, 2008) (further determining that the insurer did not satisfy the requirement by delivering the policy to the purchaser when it failed to deliver the policy to the named insured).

The relevant inquiry becomes, therefore, whether GAIC's failure to comply with the statute prejudiced BLH.  In *W.G. Yates & Sons*, Judge Steele considered whether a named insured who did not receive a copy of the policy was prejudiced by that failure when the insurer later refused to pay a claim for a crane accident resulting in bodily injury.  *Id.* at *9.  The insurer claimed that the policy excluded coverage for the action.  *Id*.  Judge Steele concluded that the contractor was not prejudiced, finding that even if the contractor had received a copy of the policy, it likely would have read the exclusion to include coverage for the accident, just as it did at the time of the litigation.  *Id*. at *9, n.20 ("[T]he cornerstone of [the

plaintiff's] position in this lawsuit is that Price's activities were covered under the Policy and were outside the scope of the Exclusion.  Given how emphatically [the plaintiff] has taken that position, it would be disingenuous for [the plaintiff] to argue that if it had only known about the Exclusion beforehand it would have procured additional insurance so there would be coverage for Price's crane activities.").

Here, BLH claims that it "was prejudiced by not being provided with a copy of the Policy because [BLH] was never put on notice as to any coverage provision, or condition prior to performing work on the Five Mile Creek Modifications." Doc. 49 at 28.  BLH does not explicitly argue that, had it known about the condition, it would have taken different actions.  Rather, as in *W.G. Yates & Sons*, BLH takes the position that construction of the New Headworks Facility remained covered by the Policy at the time of the flood.  BLH's conclusory statements of prejudice are insufficient proof to estop GAIC from applying the condition solely on the basis that GAIC failed to fulfill the delivery requirement.[16]

---

[16]BLH further argues that GAIC is estopped from asserting the condition because GAIC only provided the JCC with a reservation of rights letter.  Doc. 49 at 30-32.  An insurer issues a reservation of rights letter when it undertakes the defense of its insured, but preserves its right to assert coverage defenses in a later declaratory judgment action.  *See* 14 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance*, § 202:4 (3d ed. 2010); *see also Burnham Shoes, Inc. v. W. Am. Ins. Co.*, 504 So. 2d 238, 241 (Ala. 1987), *overruled on other grounds by Williamson v. Indianapolis Life Ins. Co*, 741 So. 2d 1057, 1059 (Ala. 1999) ("[A]n insurer who undertakes to defend an insured without reserving the right to withdraw its defense, thereby waives its right to do so.").

### B.     The Policy Is Not Ambiguous.

BLH next argues that "put to its intended use" is ambiguous, and that

GAIC's interpretation of that provision defeats the reasonable expectations of the

insured.  Doc. 49 at 19-28.  "It is well settled in Alabama that ambiguities in an

insurance contract are to be construed in favor of the insured and that 'exceptions

to coverage must be interpreted as narrowly as possible in order to provide

maximum coverage to the insured.'" *Brown Mach. Works*, 659 So. 2d at 59

(quoting *Amerisure Ins. Co. v. Allstate Ins. Co.*, 582 So. 2d 1100, 1102 (Ala.

1991)).  "It is equally well settled in Alabama, however, that unambiguous policies

are to be enforced as written."  *Id*. (citations omitted).  "If the terms within a

contract are plain and unambiguous, the construction of the contract and its legal

effect become questions of law for the court and, when appropriate, may be

decided by a summary judgment."  *McDonald v. U.S. Die Casting & Dev. Co.*, 585

So. 2d 853, 855 (Ala. 1991) (citation omitted).  "However, if the terms within the

contract are ambiguous in any respect, the determination of the true meaning of

the contract is a question of fact to be resolved by a jury."  *Id*. (citation omitted).

"The question whether a contract is ambiguous is a question of law for the

---

Here, GAIC has not undertaken the defense of BLH, nor has it denied coverage.  Rather, it has
instituted this declaratory judgment action to determine whether it must pay the claim BLH has
asserted under the Policy.  Whether BLH received a reservation of rights letter simply has no
bearing on this dispute.

courts." *Id*. (citation omitted).  "The test to be applied by a court in determining whether there is ambiguity is not what the insurer intended its words to mean, but what a reasonably prudent person applying for insurance would have understood them to mean." *Miller v. Allstate Ins. Cos.*, 896 So. 2d 499, 503 (Ala. Civ. App. 2004) (citations and internal quotations marks omitted).  "In determining whether an ambiguity exists, a court should apply the common interpretation of the language alleged to be ambiguous. . . .  [T]he terms of an insurance policy should be given a rational and practical construction."  *Id*.  (citations omitted) (finding no ambiguity when "your work" was defined but "work" was not); *see also Caribbean I Owners' Ass'n, Inc. v. Great Am. Ins. Co. of N.Y.*, 600 F. Supp. 2d 1228, 1245 (S.D. Ala. 2009) ("[A]mbiguities cannot be constructed from thin air by strained or twisted reasoning in interpreting the language. . . .  Furthermore, the mere fact that a word or a phrase used in a provision in an insurance policy is not defined in the policy does not mean that the word or phrase is inherently ambiguous." (citations and internal quotation marks omitted)).  Furthermore, "the court must examine more than an isolated sentence or term; it must read each phrase in the context of all other provisions."  *Royal Ins. Co. of Am. v. Thomas*, 879 So. 2d 1144, 1154 (Ala. 2003) (citations and internal quotations marks omitted).

Critically, the fact that parties disagree on a policy's interpretation does not render the policy ambiguous.  2 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 21:14 (3d ed. 2010).  Nor are policy provisions ambiguous "merely because it is difficult to apply the factual situation to the specific policy language." *Id.*

BLH argues that Condition 6(d) is ambiguous because the Policy does not define "intended use" or "put to intended use" and the Policy does not address whether a structure can be tested without being deemed put to its intended use. Doc. 49 at 19-24.  GAIC contends that the Policy is not ambiguous, disputes that testing was ongoing at the time of the flood, and argues that the court's determination will turn on the court's "interpretation of the policy language against the material facts."  Doc. 97 at 12-13.

The portion of the Policy containing the disputed provision provides:

**6.  When Coverage Begins and Ends**

We cover from the time the Covered Property is at your risk starting on or after the date this policy begins.

This coverage will end on each structure when any of the following occurs:

    a.    the purchaser accepts it;
    b.    your interest in the Covered Property ceases; or you abandon the construction;
    c.    90 days after the structure is "substantially completed" (if no

work on the structure has taken place during that period);

d.      when a structure is occupied or put to its intended use, without our written consent;

e.      any other insurance covers the property as a completed building or structure;

f.      this Coverage Form is cancelled; or

g.      the end of the policy period.

Doc. 60 at 12.  A "builder's risk" policy like the one at issue here is designed to insure a structure during the "course of construction."  7 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 102:29 (3d ed. 2010).  Several of the termination provisions in Condition 6, including 6(d), are designed to clarify when construction is deemed to have terminated.  Read in this context, although not specifically defined, Condition 6(d) is capable of a "rational and practical" construction that a "reasonably prudent person applying for insurance" would understand.  *See Miller*, 896 So. 2d at 503.  The dictionary definitions of "put," "intend," and "use" further illustrate that the phrase in the Policy has a rational and practical construction:

Put:        to bring into or establish in a specified state or condition;

Intend:     to design for or destine to a specified purpose or future;

Use:        a particular service or end.

*Webster's Third New International Dictionary*, 1175, 1849, 2523 (3d ed. 1976).

The phrase "put to its intended use" therefore means to bring into the particular

27

service or end for which the structure was designed.

Here, the parties offer differing interpretations of how this provision applies to the facts: GAIC posits that the New Headworks facility was put to its intended use the day that the pumps began running on a continuous basis; BLH contends that the New Headworks facility was not yet put to its intended use because certain features were not installed and other features were still being tested. However, the fact that the parties do not agree on a policy's interpretation does not render the policy ambiguous. 2 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 21:14 (3d ed. 2010); *see also Martco Ltd. P'ship v. Wellons, Inc.*, 588 F.3d 864, 881 (5th Cir. 2009) (applying common meaning of "put to its intended use," which did not have a technical meaning or policy-specific definition).

Furthermore, the provision is not ambiguous simply because it is difficult to apply. 2 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 21:14 (3d ed. 2010). There is no doubt that applying the provision is complicated by the fact that the New Headworks Facility is part of a complex sewage treatment facility. Nevertheless, whether the JCC and BLH had brought the New Headworks Facility into the particular service or use for which it was designed depends on the factual posture at the time of the flood. As discussed more fully below, the undisputed facts show that the New Headworks Facility had several functions aside from

pumping and that the upgraded New Headworks Facility was designed to include all such functions in an automated manner.  The Policy is therefore not ambiguous.[17]

Having determined that the Policy is not ambiguous and that BLH is not entitled to any presumption in its favor, the court turns to the crux of this dispute: whether either party has presented undisputed facts sufficient to entitle that party to summary judgment on the coverage issue.

### C. The Policy Did Not Terminate Prior to the Flood.

A number of courts have considered the application of "put to its intended use" provisions in insurance policies.  The court, however, finds only limited assistance in Alabama state law, which governs this dispute.  In *Southern Guaranty Insurance Company v. Scott*, 266 So. 2d 602 (Ala. 1972), the Supreme Court of Alabama considered whether an insurance policy issued to a seller of anhydrous ammonia covered injuries sustained by a buyer when a hose transferring the ammonia from the seller's tank to the buyer's applicator ruptured.

---

[17]Additionally, BLH's insistence that the court must find the Policy ambiguous because it fails to delineate when a structure can be "tested" but not put to its intended use is unavailing. Whether a structure is being "tested" but not yet put to its intended use ultimately turns on the construction contract requirements and construction progress – a "testing" label cannot be affixed as a talisman to defeat the intended use condition notwithstanding the actual facts of the case. Nevertheless, as discussed below, the undisputed facts establish that Condition 6(d) does not apply.  It is therefore unnecessary to find that the Policy's failure to delineate when "testing" would be covered renders the Policy ambiguous.

The insurance policy deemed operations completed, *inter alia*, "when the portion of the work out of which the injury . . . arises has been put to its intended use by any person . . . ." *Id.* at 607.  The court concluded that if this alternative even applied to the situation at issue, the operation "had not reached the stage where the work had been put to its intended use.  The intended use was as a fertilizer. Therefore, the work of the [buyer] would have had to reach the stage where the liquid nitrogen was actually fertilizing the growth of crops on the land." *Id*.  The court further explained: "It is rather obvious that the intention of this alternative is to apply to factual settings similar to where a building contractor has completed his work on a residence house.  Under such circumstances his work would be completed on a residence building when it becomes occupied (put to its intended use)." *Id*.

Other courts have considered cases more analogous to this one in which a structure has arguably been put to its intended use or some limited use before construction is entirely complete.  In general, courts have declined to find a building "put to its intended use" when significant work remains, even if the building has been used or occupied on some limited basis.  In *Cuthrell v. Milwaukee Mechanics Insurance Co. of Milwaukee, Wisconsin*, 66 S.E.2d 649 (N.C. 1951), the Supreme Court of North Carolina considered whether a building

designed for restaurant and recreation purposes was "completed" and "occupied,"
thereby terminating the builder's risk policy, when the plaintiff permitted a college
student to conduct a dance in the uncompleted building approximately six days
prior to the date a fire occurred.  The court stated: "A building is completed if, and
only if, it has reached that stage in its construction when it can be put to the use for
which it is intended."  *Id*. at 651 (citations omitted).  The court further concluded
that the building was incomplete, and had not reached the stage in its production
when it could be put to its intended use, when:

> Braces, doors, inside molding, and partitions had not been placed in
> various parts of the structure; only two-thirds of the building had
> been covered by the first of two coats of paint; the bath house, the
> kitchen, the outside of the building, the picnic terrace, and the roof
> garden lacked electrical wiring; the cabinet work had not been done
> in the storage room; the cooking fixtures and plumbing 'had not been
> set up' in the kitchen; the lockers, plumbing, and shower equipment
> had not been installed in the bath house; the walls of the picnic
> terrace had not been erected, and built-in tables had not been put
> there; the supports of the roof garden and the banister on the stairway
> leading to it had not been finished; and the masonry floor had not
> been laid on the roof garden.

*Id*.  The court further concluded that the dance held on April 29, 1950 was nothing
"more than a mere transient or trivial use."  *Id*. at 652.

The Tenth Circuit reached the same conclusion in a case involving the
interpretation of a builder's risk policy for a steel grain storage building.  *Reliance
Ins. Co. v. Jones*, 296 F.2d 71 (10th Cir. 1961).  In that case, the building owner

31

temporarily stored approximately 7,000 to 10,000 bushels in the building (which had a capacity of approximately 200,000 bushels) during the building's construction. *Id*. at 72-73. The court found that "the building was never put to anything more than a mere transcient [sic] or trivial use" as the grain storage was limited and temporary and that "it was impossible to use the machinery which was installed in the building since the work was not complete nor had the new machinery been tested." *Id*. at 73-74; *see also Commercial Standard Co. v. Rhode Island*, 193 F.2d 375 (5th Cir. 1952) (finding builder's risk policy in effect on construction of church when (1) approximately six hours of construction work remained, and (2) the church was not occupied or used as a church as the pews and furniture were not installed).

By the same logic, courts have also found projects "put to their intended use" when only *de minimus* work remains or when the building's or the machine's owner takes control from a contractor. For example, the Fifth Circuit recently examined a "put to its intended use" provision in an insurance policy. *Wellons, Inc.*, 588 F.3d 864. In that case, a manufacturer hired Wellons, a manufacturer of energy systems to design and install certain improvements to its existing Wellons-brand thermal heating system located in one of its plants. *Id*. at 870. The plant commenced a planned thirty-day shutdown in December 2002 to service the unit

and resumed production on January 28, 2003, after which numerous problems

arose with the Wellons unit.  *Id.*  The insurance policy definition for a "products -

completed operations hazard" stated that work would be deemed completed

"[w]hen that part of the work done at a job site has been put to its intended use by

any person or organization other than another contractor or subcontractors

working on the same project.  Work that may need service, maintenance,

correction, repair or replacement, but which is otherwise complete, will be treated

as completed."  *Id*. at 880 n.13.  The court determined that the work was "put to its

intended use" and therefore completed on January 28, 2003, when the plant owner

re-started the plant and "began employing the Wellons unit as part of its factory."

*Id*. at 881; *see also Fireman's Fund Ins. Co. v. Millers' Mutual Ins. Ass'n.*, 451

F.2d 1140, 1141-42 (10th Cir. 1971) (finding that builder's risk policy did not

cover fire damage when the construction company had removed its workers from

the site, the plant owner had begun storing materials in the plant and had made

some sales of sacked fertilizer from the building, and the one item to be completed

– a ten percent scale adjustment – was "of such a *de minimus* nature as to deny the

palpable fact of completion");  *Hendrix v. New Amsterdam Cas. Co.*, 390 F.2d

299, 302, 304 (10th Cir. 1968) (finding that insured breached policy condition

requiring no occupancy without the insurer's consent when "the building . . . had

been rented to prospective buyers and such renters regularly occupied it as living

quarters for approximately two and a half months ending some fourteen days prior

to the fire"; further rejecting insured's argument that the structure was not

"complete" merely because very minor items, including the installation of kitchen

cabinet shelves, remained unfinished); *McCarty v. Md. Cas. Co.*, 429 F. Supp.

112, 116 (D. Ark. 1976) (concluding that a "builder's risk policy insuring a

building intended for manufacturing purposes . . . became occupied when it was

used for a purpose within the contemplation of the parties, provided the use was

not to test the building for defects and provided the use was not transient or

trivial"; further finding the building occupied when the owner leased 43% of the

building's floor space for storage).

Similarly, in *Hanover Insurance Company v. Hawkins*, which GAIC urges

the court to follow, the Seventh Circuit addressed an insurance policy with a

"completed operations hazard" exclusion, which defined completion of operations

as "when the portion of the work out of which the injury or damage arose had been

put to its intended use by any person." 493 F.2d 377, 379 (7th Cir. 1974). In

*Hanover*, a company installed a heater in a camping trailer for a customer, who re-

took possession of the trailer and new heater despite the fact that the paneling and

bracing had not been fully installed and would be completed when the customer

34

returned with the camper at a later date.  *Id*. at 379.  As advised, the customer left the heater operating overnight to facilitate re-lighting it, and the following morning the trailer exploded from escaped gas.  *Id*.  The Seventh Circuit declined to find that the customer was operating the heater solely to "break it in" rather than for human habitation: "It is patently undeniable that the heater's pilot light had been lit and left operating in the camper in a manner envisioned by both the contractor and the consumer. . . .  [I]t is clear that both Custom Camper and Stewart intended to operate the heater and thus put it to its intended use when the pilot light was lit."  *Id*. at 379-80.

GAIC contends: "[T]he New Headworks Facility had been put to its intended use prior to the flood.  The New Headworks Facility was designed to receive influent, perform basic filtering, and divert the influent for treatment, which is what it began doing on continual basis beginning on November 7, 2007.  Therefore, it is irrelevant whether any testing was still occurring at the time of the flood or whether some components had yet to be installed."  Doc. 92 at 14.  Under the cases cited above, the court could potentially agree with GAIC if the "components . . . yet to be installed" were entirely minor or primarily cosmetic, such as the kitchen cabinets in *Hendrix*, the ten-percent scale adjustment in *Fireman's Fund Insurance*, or the paneling and bracing in *Hanover*.  *Hendrix*, 360

F.2d at 304; *Fireman's Fund Ins.*, 451 F.2d at 1142; *Hanover*, 493 F.2d at 379.
Such trivial adjustments do not fundamentally alter the use of a structure or a
machine.

In this case, however, although the influent pumps were installed and
functioning, there was a long list of components that were not installed, fully
operational, tested, or accepted.  *See* Doc. 49 at 5; Doc. 21 at 9-11.  In particular,
the parties agree this list includes the aeration blowers, the generators, and perhaps
most critically, the control system.  Indeed, the JCC operators were not even
housed in the New Headworks Facility control room because electrical control
systems were not in place and the building did not have a certificate of occupancy.
Doc. 63 at 20 (Dep. p. 19); Doc. 64 at 14 (Dep. p. 13).

Even assuming, as GAIC asserts, that the *pumps* were fully tested and had
completed their final thirty-day continuous operation test period, this fact alone
does not establish that the New Headworks Facility had been put to its intended
use.  First, unlike *Wellons* or *Fireman's Fund Insurance*, in which the courts
found that the intended use provision applied, BLH had active construction crews
onsite working on a number of remaining items.  *Wellons*, 588 F.3d at 881 (plant
re-started under owner's control); *Fireman's Fund Ins.*, 451 F.2d at 1142
(construction company had removed its workers from the site).  Second, GAIC's

case rests on an oversimplication of the New Headworks Facility's function and purpose, which was to replace and upgrade the still-functional Old Headworks Facility. The upgrades included full automation, which remained incomplete on the date of the flood. To suggest that the New Headworks Facility was put to its intended use when it began pumping sewage, fundamentally mischaracterizes the nature of the project that GAIC agreed to insure and is no different than the argument in *Cuthrell* that a restaurant was put to its intended use when the owner permitted a social gathering to be held there despite the fact that construction on the restaurant was far from complete. 66 S.E.2d at 651.[18] Third, GAIC's position fails to take into account the fact that the Five Mile Creek Wastewater Treatment Plant had to remain operational during the construction. The operations in the Old Headworks Facility had to be shifted to the New Headworks Facility before the former building could be repurposed. During that shift, the JCC, as the NPDES permit holder, had to remain in control of any sewage treatment operations. This presents a fundamentally different arrangement than *Wellons*, in which the plant shut down for a month for the contractor to make the repairs and then restarted

---

[18]Furthermore, *Hanover*, 493 F.2d 377, the case GAIC urges the court to follow, is difficult to analogize to the current case. *Hanover* involved installation of a camper heater – undoubtedly a far less complicated project than upgrading a complex sewage treatment plant. Furthermore, in *Hanover*, the owner of the camper accepted the installed heater on the promise that the seller would correct the loose panels and bracings. In this case, construction on the New Headworks Facility remained active while the pumps began to run.

under the owner's control, 588 F.3d at 881, or *McCarty*, when the owner leased

out almost half of the building alleged to be under construction, 429 F. Supp. at

116.  Consequently, the fact that continuous pumping began in the New

Headworks Facility prior to the completion of construction, without more, does

not establish that the New Headworks Facility was being employed for the

purpose for which it was designed.  Thus, the court finds that Condition 6(d) does

not apply to terminate coverage.

### D.  *The Warranty Exclusion Does Not Apply.*

GAIC half-heartedly argues that the Policy does not cover BLH's losses

because of a Policy exclusion for losses covered by a contractor's warranties.

Doc. 92 at 22-23.  The Policy provides:

> 5.  We will not pay for:
> . . .
> b.  Any "loss" covered under any guarantee, warranty or
>     other expressed or implied obligation of any contractor,
>     manufacturer or supplier.  This exclusion applies
>     whether or not such contractor, manufacturer or supplier
>     is a Named Insured.

Doc. 93-2 at 22.  The warranty in the subcontract between UCC and BLH

provides:

> 21.  **Warranty.**  Subcontractor warrants and guarantees the Work to
> the full extent provided for in the Contract Documents.  Without
> limiting the foregoing or any other liability or obligation with respect
> to the Work, Subcontractor shall, at its expense and by reason of its

38

> express warranty, make good any faulty, defective, or improper parts
> of the Work discovered **within one year from the date of**
> **acceptance of the Project by the Architect and Owner** or within
> such longer period as may be provided in the Contract Documents.

Doc. 93-11 at 8 (emphasis added).  GAIC argues that, since UCC warranted that

the computer system controlling the pumps would work properly and its failure

caused the flood, this warranty covers BLH's damages.  Doc. 92 at 23.

"Under Alabama law, the insurer bears the burden of proving the

applicability of any policy exclusion."  *Universal Underwriters Ins. Co. v. Stokes*

*Chevrolet, Inc.*, 990 F.2d 598, 604 (11th Cir. 1993) (citations omitted).  GAIC

fails to meet this burden because it does not establish that a warranty was in place

at the time of the flood.  GAIC first argues that the "control system" that failed

was different from the SCADA control system, which the parties agree was not

fully operational.  Doc. 100 at 8-9.  The evidence to which GAIC cites, however,

does not indicate that a control system separate and different from the SCADA

control system operated the pumps.  Rather, as BLH points out, Holbrook clarified

on the second day of his deposition that "control systems" in the New Headworks

Facility referred to the SCADA control system.  Doc. 87 at 83-84 (Dep. p. 322-

23); *see also* Doc. 61 at 33-35 (Dep pp. 32-34).  Given that GAIC admitted

numerous times[19] that the SCADA control system was not fully operational or

tested and presents no evidence to the contrary, the court declines to find that the

control system for the pumps was complete at the time of the flood.

GAIC further argues that "[t]he one year provision in the subcontract merely

defines the limit of the warranty.  It does not define when the warranty begins as

any subcontractor warrants its own work during the installation of any structures

or systems."  Doc. 100 at 9.  Unfortunately, GAIC does not cite to any legal

authority standing for that proposition, and the court finds that GAIC's assumption

is not sound.  Rather, the language of the warranty establishes that it runs for a

year, beginning on the date of acceptance.  Doc. 93-11 at 8; *cf. City of

Birmingham v. Cochrane Roofing & Metal Co.*, 547 So. 2d 1159, 1163 (Ala. 1989)

("In a claim based on breach of warranty to construct a building in a workmanlike

manner, the cause of action accrues, and the statute of limitations begins to run, on

the date that the defendant completes performance, because by '[b]y its very nature

it is the failure to construct the house in a workmanlike manner that constitutes the

breach.'" (quoting *Stephens v. Creel*, 429 So. 2d 278, 280 (Ala. 1983)).  Because

neither the SCADA control system, the New Headworks Facility, nor the Five

---

[19]*See* Doc. 97 at 4-5 ¶¶ 13-14, 24; Doc. 100 at 2 ¶¶ 1-2.

Mile Project had been accepted at the time of the flood,[20] GAIC fails to establish that UCC's warranty was in place on December 15 or 16.  Therefore, the exclusion does not apply.

## V.        CONCLUSION

For the reasons set forth above, GAIC's motion for summary judgment is DENIED.  BLH's motion for summary judgment is GRANTED, in part.  The court finds that the Policy covered the flood occurrence and BLH is entitled to recover the costs incurred for cleanup and repair.  The court finds, however, that the parties are entitled to further discovery, if necessary, on damages.  Within **twenty-one (21) days** of the date of this order, the parties shall submit a joint status report setting forth what further discovery on damages, if any, is required, and a reasonable schedule for completing that discovery and briefing any remaining disputes.

---

[20]Holbrook testified, based upon a letter from Hendon Engineering to B.L. Harbert, that warranties did not go into effect until after April 4, 2008, the date when the JCC took over full operation of the New Headworks Facility.  Doc. 61 at 132 (Dep. p. 131); *see also* Doc. 68 at 25 (Letter from Hendon Engineering on February 8, 2008, suggesting that the one year mechanical warranties for individual pieces of equipment could begin upon the Plant Manager's agreement). The Plant Manager testified that the JCC had not accepted the New Headworks Facility at the time of the flood.  Doc. 64 at 10-11, 30-31 (Dep. p. 9-10, 29-30).

DONE this 16th day of September, 2010.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE